**In re Aleshia D. PATTERSON, Debtor.**

**Aleshia D. Patterson, Plaintiff,**

**v.**

**Chrysler Financial Co., Defendant.**

**Bankruptcy No. 99–35259DWS.
Adversary No. 00–0258.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 24, 2001.

Ronald G. McNeil, Philadelphia, PA, for Plaintiff.

Joseph M. Garemore, Mt. Laurel, NJ, for Defendant.

Mitchell W. Miller, Philadelphia, PA, Chapter 7 Trustee.

Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA, United States Trustee.

### OPINION

DIANE WEISS SIGMUND,
Bankruptcy Judge.

The instant adversary proceeding arises out of the repossession and subsequent post-petition sale of the debtor, Aleshia D. Patterson's ("Debtor"), automobile by the defendant, Chrysler Financial Co. ("Chrysler"), in alleged violation of the automatic stay and certain Pennsylvania consumer protection laws. The background of this case was discussed at length in my Memorandum Opinion denying cross-motions for summary judgment, *Patterson v. Chrysler Financial Co.*, 2000 WL 1692838 (Bankr. E.D.Pa.2000), and will not be repeated

again except as necessary to set forth the findings of fact in support of my conclusions of law.

### PROCEDURAL HISTORY

On December 6, 1999, the Debtor filed a Voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code.[1] On March 30, 2000, the Debtor commenced this adversary proceeding by filing an eight-count Complaint titled "Debtor's Complaint seeking Turnover of Property and Damages for Violation of the Automatic Stay." The parties stipulated to dismissal of several counts and amendment of Counts II and VII, resulting in the pendency of the following causes of action: Counts I, II, and IV allege a violation of the automatic stay;[2] Count VII alleges a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, *et seq.*; and Count VIII alleges intentional and/or negligent infliction of emotional distress. Trial on these counts was held on February 23 and March 19, 2001.[3] On March 21, 2001, shortly after trial in this matter, the Debtor converted her Chapter 13 case to one under Chapter 7 of the Bankruptcy Code. Mitchell Miller, Esquire serves as the Chapter 7 trustee.

### FINDINGS OF FACT

1. On or about February 1, 1995, the Debtor purchased an automobile, a 1995

1. I shall take judicial notice of the docket entries in this case. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi*, 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino*, 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.*, 61 F.3d 197 (3d Cir.1995).

2. Count I is based on Chrysler's attempt to collect Debtor's debt to it by selling a repossessed automobile owned by Debtor without obtaining relief from the automatic stay, and Count II is based on Chrysler's failure to turn

over the automobile after receiving notice of the bankruptcy filing. Count IV alleges that Chrysler has "willfully violated an order of this Honorable Court," but fails to identify any specific Order. I can only assume that the Debtor is referring to the automatic stay itself as an "Order" of the Court and will therefore view Count IV as duplicative of Count I.

3. The parties agreed that Counts I, II, and IV constitute core proceedings and consented to the Court's hearing and final determination of the related proceedings framed by Counts VII and VIII. *See* 28 U.S.C. § 157(c)(2).

Plymouth Neon (the "Automobile"), with funds borrowed from Chrysler which was granted a first lien on the Automobile to secure repayment.

2. In the early morning hours of November 1, 1999,[4] Chrysler repossessed the Automobile because Debtor was in default by reason of failing to make approximately three payments under the loan agreement. The repossession was conducted by Steven Bennett, an employee of Horton Brothers Recovery, Inc. ("Horton Bros."), on Chrysler's behalf.

3. Mr. Bennett met with the Debtor that morning, and obtained the key(s) to the Automobile from the Debtor who, at Bennett's direction, removed her personal possessions before the Automobile was removed.[5]

4. After the repossession, Chrysler mailed a "Notice of Repossession" dated November 1, 1999 to the Debtor, advising her that the Automobile would be "offered for sale, at private sale beginning on 11/17/1999, and from day to day thereafter until sold." The Notice also provided the Debtor with the option of recovering the Automobile by reinstating her contract at any time prior to sale. Ex. P–2.[6]

5. The Notice of Repossession conditions reinstatement of the contract as follows:

You have the right to renew your contract AT ANY TIME BEFORE IT IS SOLD. To renew the contract, you must pay us the NET AMOUNT NEEDED TO REINSTATE (below), plus any other amounts which may become due after the date of this Notice.

It then identifies past due payments, late charges and costs of $991.20 (the "Arrears") as the "NET AMOUNT NEEDED TO REINSTATE." *Id.* (capitalization in original).

6. The Debtor contacted Chrysler on November 3, 1999 and spoke to Michael Conroy, Chrysler's customer service representative for Debtor's account. Mr. Conroy told the Debtor that, in addition to payment of the Arrears, she also had to submit a new credit application, four new references, and proof of insurance as a condition of reinstating her contract and recovering the Automobile. Ex. D–11.

7. Andrew Kulba, Mr. Conroy's supervisor, testified that this requirement for additional information was in accordance with Chrysler's policies and practices regarding reinstatement after repossession. Both Kulba and Conroy testified that the credit application and references were required, not for the purposes of determin-

---

4. The testimony and evidence indicates the Automobile was repossessed sometime between 12:00 a.m. and 2:00 a.m.

5. The Debtor presented testimony, both from herself and her friend Maureen Harris, regarding merchandise the Debtor allegedly purchased with cash on a shopping spree the day before the Automobile's repossession. The Debtor alleges that this merchandise, along with receipts, were in the Automobile when it was repossessed. The Debtor acknowledges that she did not subsequently contact Chrysler or Horton Bros. regarding any personal items left behind in the Automobile. I find the testimony of the Debtor and Ms. Harris on this issue to be incredible.

Moreover, I find the testimony of Steven Bennett, that the Debtor was given the opportunity to and did in fact remove personal possessions from the Automobile, fully credible.

6. The Notice of Repossession is a form that allows Chrysler to indicate whether it offers the right of reinstatement and if so, the payment amount required to effect a reinstatement. If reinstatement is not offered, the debtor may redeem the vehicle by paying the full contract amount. In Debtor's case, Chrysler did not check the box on its form that precedes the statement: "If this box is checked, you do not have the right to reinstate your contract." *Id.*

ing credit-worthiness, but solely as a means for Chrysler to locate the Debtor.[7]

8. Based on the information in the Notice of Repossession and her conversation with Mr. Conroy, the Debtor sent two payments of $800 and $300 on November 16 and 17, respectively, totaling $1,100 (the "November 1999 payments"). Chrysler concedes receipt of these payments on or about November 16 and 17.

9. On November 18, 1999, Mr. Conroy noted in Chrysler's account record that he had still "not recvd a new credit app, proof of insurance or ability to pay" and advised Horton Bros. to take the vehicle to auction. Ex. D–11.

10. By December 2, 1999, the Debtor had submitted references, a credit application and proof of insurance, but Chrysler had concerns regarding the veracity and accuracy of much of this information and was not satisfied.[8]

11. On December 2, 1999, Mr. Conroy made notations in Chrysler's account records, expressing his concern that the Debtor was unreliable and advised his supervisor, Andrew Kulba, "not to move forward [with] any redemption on this vehicle." Ex. D–11.[9]

12. On December 6, 1999, the Debtor filed a Voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code (the "Petition"), through her attorney Ronald McNeil.

13. The day of the filing, Mr. McNeil telephoned Chrysler and spoke to Mr. Conroy. In this conversation, he informed Mr. Conroy of the pending bankruptcy.[10]

7. It appears that the Debtor's whereabouts were a legitimate concern for Chrysler. Its account records show several unsuccessful attempts to locate the Debtor prior to repossession of the Automobile and attempts to repossess the Automobile both in Ohio and Pennsylvania. Ex. D–11. The Debtor's own trial testimony indicated no less than three Philadelphia addresses and one Ohio address since 1999. Although she testified that she is currently "going back and forth" between Ohio and Pennsylvania, it is still unclear whether she has an established address in Philadelphia.

Notwithstanding the purported need to locate the Debtor, I note several entries in Chrysler's account records showing conversations between Mr. Conroy and the Debtor demanding proof of employment and ability to continue payments on the Automobile. Thus, it appears that Chrysler in fact wanted to confirm the Debtor's creditworthiness. Ex. D–11.

8. For example, Chrysler's account records indicate that two of the four references were unverifiable. Its records also show Chrysler's concern because she listed her mother as an employer on her credit application but was not able to supply any proof of payment when Mr. Conroy inquired. A day later, Mr. Conroy's notes indicate that she is now claiming to work for a medical billing company but could not provide a verifiable address for this employer. Finally, Chrysler appears to have had concerns about the validity of Debtor's automobile insurance which showed her address in Ohio. Chrysler's records show that Mr. Conroy spoke to the Debtor's insurance agent or about December 2 and was told that the policy on the Automobile, due for renewal on December 26, 1999, was subject to cancellation if the Debtor had changed addresses. Ex. D–11.

9. Both Chrysler's account records, Ex. D–11, and the testimony of several of the witnesses appear to use the term "redeem" or "redemption" interchangeably with "reinstatement." This is incorrect, as the terms are specifically defined by statute. Redemption is the act of paying off the entire amount due on the vehicle in full plus certain charges, 69 P.S. § 625, as opposed to reinstatement of the contract by payment of only past due amounts and charges. 69 P.S. § 624. As neither party has asserted that the Debtor was attempting anything more than reinstatement of the contract at issue, I view their use of the "redemption" as semantic imprecision and not intended as a legal word of art.

10. Chrysler acknowledges the receipt of a phone call that day from Mr. McNeill advising it of his representation of the Debtor but

14. Chrysler intentionally caused the Automobile to be sold at auction on December 14, 1999.[11]

15. The Debtor testified that she incurred approximately $1,500 in costs for public transportation and reimbursements to family members and friends for transportation. She was not able to identify specific occasions when she incurred these costs. Nor did she provide supporting documentary or testamentary evidence to verify these expenditures. I find the Debtor did not meet her burden of establishing that these costs were incurred.

## CONCLUSIONS OF LAW

■ As the plaintiff in this adversary proceeding, the Debtor bears the burden of proving, by a preponderance of the evidence, all of the elements of her claims just as any plaintiff would in a suit outside of bankruptcy. *See, e.g., In re Verdi,* 244 B.R. 314 (Bankr.E.D.Pa.2000). I now examine the evidence presented against the applicable law.

### I. *Violation of the Automatic Stay*

■ It is axiomatic that for Chrysler to have violated the automatic stay by exercising control over the Automobile, on the date her petition was filed the Debtor must have had a property interest in the Automobile that became part of her bankruptcy estate. The Debtor's estate is comprised of the Debtor's interest in property as of the commencement of the bankruptcy, 11 U.S.C. § 541(a)(1), and that interest is in turn governed by state law. *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

■ On the date the petition was filed, Chrysler had repossessed the Automobile but had not sold it. If Debtor still had a right to recover the Automobile, she had a property interest protected by the automatic stay. *See General Motors v. English (In re English),* 20 B.R. 877, 878–79 (Bankr.E.D.Pa.1982) (finding that Debtor had limited property interest in automobile repossessed pre-petition as defined by the MVSFA). According to the Notice of Repossession, the Debtor had the right to renew her contract through reinstatement or redeem the Automobile by full payment "AT ANY TIME BEFORE IT IS SOLD." Ex. P–2 (capitalized in original).[12] The

contends that no notice of the bankruptcy filing was given nor copy of the Petition provided. Mr. McNeil is an experienced bankruptcy attorney who filed the bankruptcy case for the sole purpose of staying Chrysler from selling the repossessed Automobile when Debtor was unsuccessful in securing reinstatement of her contract upon payment of the $1100. He testified that he informed Chrysler of the filing of the bankruptcy on the day he filed it and subsequently sent a copy of the Petition to Chrysler. I find it incredible that Mr. McNeill did not inform Chrysler of the newly filed case during the contemporaneous phone call with Chrysler's representative. While I also accept Mr. McNeill's genuine belief that he sent a copy of the Petition to Chrysler via facsimile, I do not find his documentation evidencing the facsimile transmission, Ex. P–10, or his record-keeping procedures to be reliable evidence of his having done so.

11. I note, an entry in the account records, Ex. D–11, on December 16, 1999: "Auction Payment $1,181.20." However, neither of the Chrysler witnesses testified as to the amount it received from the sale of the Automobile at the auction. Notably the parties stipulated to the value of the Automobile, presumably based on the Blue Book, as $3,825 wholesale and $5,225 retail. No effort was made to reconcile the stipulated value, the actual sale price and the auction payment, if different.

12. While the MVSFA provides a 15 day period after notice for redemption or reinstatement, 69 P.S. § 626A, Chrysler waived that requirement when it extended the period until the automobile was sold. *Haines v. General*

Automobile was sold on December 14, 1999.[13] As of that date, Debtor contends that she had complied with the Notice of Repossession so that Chrysler was obligated to return the Automobile to her. Significantly, even if she had not yet complied, she would still have had the right to do so since the Automobile had not been sold as of the date bankruptcy was commenced. *Id.; General Motors Acceptance Corp. v. Morgan (In re Morgan)*, 23 B.R. 700, 702 (Bankr.E.D.Pa.1982) (because debtor filed Chapter 13 petition during period in which he could exercise his right of redemption, that right was property of the estate as of date of filing or petition). *Compare Weiser v. Pennsylvania Nat'l Bank (In re Weiser)*, 44 B.R. 224, 225 (Bankr.M.D.Pa.1984) (petition to redeem filed subsequent to redemption period so car was not property of the estate under § 541). Therefore, there can be no doubt that Chrysler's post-petition sale of the Automobile, without first seeking court approval, was a violation of the automatic

stay under 11 U.S.C. §§ 362(a)(3), (a)(4), (a)(5) and (a)(6). *Koresko v. Chase Manhattan Financial Services, Inc. (In re Koresko)*, 91 B.R. 689, 700 (Bankr.E.D.Pa. 1988) (holding that post-petition sale of vehicle repossessed pre-petition violates these provisions of Section 362); *In re Skinner*, 90 B.R. 470, 473–74 (D.Utah 1988) (imposing contempt sanctions for post-petition sale of vehicle repossessed pre-petition);[14] *In re Willis*, 34 B.R. 451, 453–54 (Bankr.M.D.N.C.1983) (holding that creditor's acceptance of deposit for sale of repossessed vehicle after being told of impending bankruptcy filing the following Monday and completion of the sale on the Monday of filing constituted enforcement of its lien in violation of Section 362).[15]

■ A stay violation alone, however, does not provide the Debtor in this case with an effective remedy. While the sale by Chrysler in violation of the stay is

*Motors Acceptance Corp. (In re Haines)*, 10 B.R. 856, 858 (Bankr.E.D.Pa.1981).

**13.** The Notice of Repossession indicated it would be offered "at private sale beginning on 11/17/99, and from day to day thereafter until sold." *Id.* Notwithstanding a miscommunication to the contrary by one Chrysler representative, it was not sold at auction until almost one month later and eight days *after* the debtor filed this bankruptcy case.

**14.** The district court in *Skinner* limited its analysis to whether sanctions were warranted given the bankruptcy court's finding that the violation of the stay was not willful. *Id.* at 475. Nevertheless, it is clear that the *Skinner* court considered the post-petition sale of an automobile repossessed pre-petition to constitute at least a technical violation in order for it to go on to the next step of analyzing willfulness.

**15.** The Debtor also alleges that the automatic stay was violated earlier, when Chrysler refused to turn over the automobile pursuant to

11 U.S.C. § 542(a) upon becoming aware of the filing of the Petition on December 6. Debtor overstates the law in this regard. Turnover is required only where the debtor proves the secured creditor's secured interest is adequately protected. *Loof v. Frankford Trust Co. (In re Loof)*, 41 B.R. 855, 856 (Bankr.E.D.Pa. 1984); *Associates Commercial Corp. v. Attinello (In re Attinello)*, 38 B.R. 609, 611 (Bankr. E.D.Pa.1984). Absent proof of adequate protection, Chrysler would have been warranted in retaining the automobile. The issue of adequate protection was not addressed by either party. However, given my finding below, *infra* § IV, that the Debtor's claim for damages arising from her loss of use of the Automobile is not supported by adequate evidence, whether the stay violation occurred on December 14 when the Automobile was sold or eight days earlier is of no practical relevance. This minor time difference is even more inconsequential because Chrysler would still have been allowed a reasonable period of time after notice of the bankruptcy to effect the turnover. *See In re Belcher*, 189 B.R. 16, (Bankr.S.D.Fla.1995) (finding four to five days to be reasonable time for turnover).

arguably void *ab initio, In re Siciliano,* 13 F.3d 748, 751 (3d Cir.1994), undoing the auction sale to a bona fide purchaser without notice of the bankruptcy is another matter. Undoubtedly recognizing as much, the Debtor is seeking damages rather than demanding the return of the Automobile. She will be entitled to the remedy she seeks if Chrysler's violation of the stay was willful. 11 U.S.C. § 362(h). A violation of the stay is willful "when a creditor violates the stay with knowledge that the bankruptcy petition has been filed." *Lansdale Family Restaurants, Inc. v. Weis Food Service (In re Lansdale Family Restaurants, Inc.),* 977 F.2d 826 (3d Cir.1992) (citations omitted). "Willfulness does not require that the creditor intended to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional." *Id.*

■ Here, the evidence shows that Chrysler had actual knowledge of the bankruptcy on December 6, 1999. It is irrelevant whether Chrysler received written notice of the Petition. The telephone call of Debtor's attorney was sufficient to put Chrysler on notice of the pending bankruptcy. *Meis–Nachtrab v. Griffin, (In re Meis–Nachtrab)*, 190 B.R. 302, 306 (Bankr.N.D.Ohio 1995) (finding telephone call from Debtor alone was sufficient to put creditor on notice of bankruptcy and thus make creditor's collection acts a willful violation). *Accord Coons v. City of Siloam Springs (In re Coons),* 123 B.R. 649, 651–52 (Bankr.N.D.Okla.1991); *Sermersheim v. Sermersheim (In re Sermersheim),* 97 B.R. 885, 889 (Bankr.N.D.Ohio 1989). Further, Chrysler concedes that the stayed act, the sale of the Automobile, was intentional. Thus, its violation of the automatic stay was willful under § 362(h), and Debtor is entitled to damages as provided therein. *See* Section IV, *infra.*

Judgment will be entered in favor of Debtor on Counts I, II and IV.

## II. *Violation of the UDAP*

Like most of her sister states, Pennsylvania has adopted a statute which prohibits "unfair or deceptive acts and practices," specifically the Unfair Trade Practices and Consumer Protection law, 73 P.S. § 201–1, *et seq.* (referred to hereinafter as the "UDAP"). The UDAP prohibits the use of unfair or deceptive acts and practices in the conduct of any trade or commerce, 73 P.S. § 201–3, and provides individuals with a private right of action to recover actual damages resulting from the use of a prohibited practice in connection with a consumer's purchase or lease of goods or services for personal, family or household purposes that results in an ascertainable loss of money or property. *Id.* § 201–9.2.

■ The crux of the Debtor's UDAP claim is that she complied with the conditions of reinstatement under the Pennsylvania Motor Vehicle Sales Financing Act ("MVSFA"), 69 P.S. § 601 *et seq.,* and more specifically, § 624 MVSFA by paying $1,100 to Chrysler, an amount even more than the Arrears stated in the Notice of Repossession. Nevertheless, Chrysler "attempted to demand more than the requisite due installment payments (*i.e.,* references, new credit applications, etc.) from Plaintiff" and refused to return her automobile after she made such payments. Complaint. ¶ 45. The Debtor asserts that such conduct is a deceptive practice prohibited by the UDAP. *Id.* I agree.

■ The UDAP defines "unfair methods of competition" and "unfair or deceptive acts and practices" at 73 P.S. § 201–2(4)(i)–(xxi). Here, the Debtor invokes the UDAP's catchall definition: "Engaging in any other fraudulent *or deceptive* conduct which creates a likelihood of confusion or misunderstanding." 201–2(4)(xxi) (empha-

sis added); Complaint ¶ 45(b). This section was amended in 1996 by adding the words "or deceptive" after "fraudulent." Act of Dec. 4, 1996, P.L. 906, No. 146, § 1. Prior to the 1996 amendment, the Pennsylvania Superior Court conditioned liability under the catchall on proving the elements of common law fraud. *Rodriguez v. Mellon Bank, N.A. (In re Rodriguez)*, 218 B.R. 764, 784 (Bankr.E.D.Pa.1998) (citations omitted).[16] According to my colleague Bankruptcy Judge Raslavich, the 1996 amendment to the catch-all provision, by adding "or deceptive" to fraudulent conduct, "signals approval of these [*i.e.,* Scholl decisions] less restrictive interpretations of UDAP, and affirms the position of the Pennsylvania Supreme Court that UDAP is a remedial law that must be liberally interpreted for the purpose of abating unfair and deceptive practices." *Id.* at 784 (*quoting Creamer v. Monumental Properties, Inc.,* 459 Pa. 450, 460, 329 A.2d 812, 816 (1974) ("[s]ince the Consumer Protection Law was in relevant part designed to thwart fraud in the statutory sense, it is to be construed liberally to effect its object of preventing unfair or deceptive practices")).

Since the *Rodriguez* decision was rendered in 1998, the Pennsylvania Superior Court in *Booze v. Allstate Ins. Co.,* 750 A.2d 877 (Pa.Super.2000), *appeal denied mem.,* 766 A.2d 1242 (Pa.2000), once again held that a plaintiff must prove the essential elements of common law fraud to succeed on an UDAP claim under the catchall provision, notwithstanding the legislature's amendments. *Id.* at 880 and n. 6.[17] In its prior decisions, the Pennsylvania Superior Court had always based its requirement that the elements of common law fraud be established to sustain a UDAP violation on the fact that the plain language of the catchall provision only prohibited "fraudulent" conduct. *See, e.g., Prime Meats, Inc. v. Yochim,* 422 Pa.Super. 460, 619 A.2d 769, 773–74 (1993); *Rizzo v. Michener,* 401 Pa.Super. 47, 584 A.2d 973, 980 (1990). Nonetheless, the Superior Court found no alteration of the standard in *Booze* notwithstanding the legislature's expansion of the scope of the catchall provision beyond fraudulent conduct.

I am bound to follow Pennsylvania law as decided by its highest court. *Commercial Union Ins. Co. v. Bituminous Casualty Corp.,* 851 F.2d 98, 100 (3d Cir.

---

**16.** Prior to the amendment, former Bankruptcy Judge David A. Scholl had held that notwithstanding statutory language, liability under UDAP's catch-all provision is broader than common law fraud. Rather he found that a violation of other consumer protection statutes, including the MVSFA, was a *per se* violation of UDAP's catchall provision. *In re Fricker,* 115 B.R. 809, 823 (Bankr.E.D.Pa. 1990) (violation of Pennsylvania Debt Pooling Act violated UDAP); *Koresko, supra,* 91 B.R. at 700 (violation of MVSFA); *In re Russell,* 72 B.R. 855, 871 (Bankr.E.D.Pa.1987) (analyzing interplay of Pennsylvania's various consumer protection statutes and finding violation of any would fall under UDAP's catchall provision).

**17.** The Superior Court's opinion simply relies on a pre-amendment citation for the fraud requirement and drops a footnote noting that the court is aware of the amendment. There is no explanation or rationale as to why the amendment does not affect the court's decision. One possible explanation is that the complained of conduct occurred prior to the effective date of the statutory change. Yet one would expect the court to note as much when it recognized the occurrence of the amendment. Notably there is no legislative history illuminating the reason for the amendment. However, as general principles of statutory construction dictate that courts are obligated to give effect, if possible, to every word used by the legislative body, *In re Cohn,* 54 F.3d 1108, 1114 (3d Cir.1995), I must conclude that the addition of the word "deceptive" was to intended to cover conduct other than fraud which was clearly embraced by the pre-amendment statute.

1988). Although the decisions of lower appellate courts should be given "proper regard and are presumptive evidence of state law," *id.*, these decisions weighs less heavily where there is "persuasive data that the highest court of the state would decide otherwise." *West v. American Telephone & Telegraph*, 311 U.S. 223, 236–37, 61 S.Ct. 179, 85 L.Ed. 139 (1940). The intervention of the Pennsylvania legislature, in conjunction with the Pennsylvania Supreme Court's broad construction of the UDAP, *Creamer v. Monumental Properties, Inc., supra*, and the Superior Court's failure to provide any rationale for its continuing restrictive view of UDAP, leads me to believe that the Supreme Court would disagree with the Superior Court. To require fraud would render the statute's addition of the word "deceptive" redundant. *See e.g., Gustafson v. Alloyd Company, Inc.*, 513 U.S. 561, 573, 115 S.Ct. 1061, 1069, 131 L.Ed.2d 1 (1995) ("the Court will avoid a reading which renders some words altogether redundant"); *Berger v. Rinaldi*, 438 Pa.Super. 78, 651 A.2d 553, 557 (1994) ( "whenever possible, courts must construe a statute so as to give effect to every word contained therein").

Giving effect to the statutory amendment, I turn now to the conduct that Debtor contends was "deceptive" requiring a finding that a UDAP violation has occurred. Debtor argues that by requiring Debtor to do more (*i.e.*, provide proof of insurance, a new credit application and references) than was statutorily required of her under the MVSFA to recover the Automobile (*i.e.*, pay the Arrears), Chrysler violated UDAP.[18] The applicable provision is § 624 which states:

### Reinstatement of contract after repossession

Whenever a motor vehicle, sold under an installment sale contract, has been replevined by legal process, or repossessed otherwise than by legal process, because of default or other breach of contract, the holder may reinstate the contract and return the motor vehicle to the buyer provided the buyer pays all past due installments, or agrees with holder on mutually satisfactory arrangements, accrued default charges, costs of suit under the contract and authorized by this act in replevin by legal process, and if default at the time of repossession exceeded fifteen (15) days, expenses of retaking, repairing and storage authorized by this act.

69 P.S. § 624(A). Under the plain language of the statute, Chrysler had discretion in determining whether to offer reinstatement of the contract. The use of the precatory "may reinstate" in conjunction with a condition imposed on the buyer is difficult to understand. Does it mean, as Debtor appears to suggest, that once the holder allows reinstatement, the only conditions it may impose are payment of (1) all past due installments and (2) accrued charges and costs allowed by the statute, unless the Debtor "agrees with holder on mutually satisfactory arrangements"? *See General Motors v. English (In re English)*, 20 B.R. 877, 879 (Bankr.E.D.Pa.1982) (ordering reinstatement of contract and return of vehicle under MVSFA conditioned only upon payment of past due installments and reasonable costs). This interpretation is consistent with Chrysler's form Notice of Repossession which allows it to designate either "you do not have the

---

18. Notably, the MVSFA provides no private cause of action to remedy a violation thereunder. *Russell v. Fidelity Consumer Discount Co. (In re Russell)*, 72 B.R. 855, 871 (Bankr. E.D.Pa.1987) (concluding that UDAP was a legislative response to the "potential defect" in Pennsylvania consumer protection legislation (including the MVSFA) that fails to provide a private right of action for consumers aggrieved by most violations of these laws).

right to reinstate your contract" or "you have a the right to renew your contract" by payment of the contract arrears and costs. Ex. P–2. Presumably where there are non-monetary defaults, such as lapsed insurance, Chrysler could check off the "no reinstatement" box.

Chrysler's testimony, however, is at odds with this conclusion. While not questioned about the exercise of its discretion to allow reinstatement, Messrs. Kulba and Conroy did state that it is Chrysler's general practice and policy to require proof of insurance and the new credit application and references, in addition to the monetary cure, before reinstating. If that was all Chrysler did here, I would be reluctant to find that it had violated MVSFA. Given that the underlying contract [19] and state law requires insurance be maintained, I find it difficult to conclude that evidence of compliance runs afoul of MVSFA.[20]

■ The other two requirements are more problematic. Both Messrs. Kulba and Conroy testified that the credit application was requested to secure updated locus information about Debtor and the references to have current names and locations of persons through which it could contact Debtor if she relocated, and not to perform an updated creditworthiness evaluation. The record is clear that Debtor provided Chrysler with this information. However, Chrysler's own account records indicate that it in fact wanted to verify the Debtor's employment and ability to continue payments. The fact that it did not upon receipt of the information, reinstate her contract and return the Automobile, being unsatisfied with the quality of the information,[21] belies Chrysler's motivation for seeking it. A deceptive act is "the act of intentionally giving a false impression" or "a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it." Black's Law Dictionary at 413 (7th ed.1999). Chrysler led Debtor to believe that if she paid the Arrears and provided the information that was requested, it would reinstate her contract and return her Automobile. In reliance on these representations, which were

---

19. The bottom of the first page of the Notice of Repossession contains a separate section entitled "Insurance Rights," which states in part: "If you want your Vehicle back, you are required to keep it insured according to the terms and conditions of your contract. If you do not want your vehicle back, you should consider cancelling any insurance on it. . . ." Ex. P–2. I do not interpret this clause as a requirement of reinstatement for several reasons. First, I note that this section appears entirely segregated from that entitled "How to Get your Vehicle Back." Second, it appears to be nothing more than a statement of the Debtor's rights and obligations pertaining to insurance generally. Rather, its purpose appears to be to ensure that the debtor understands that insurance is required only when reinstatement of the contract (which requires it be maintained )is desired and to prevent the debtor from spending unnecessary funds for insurance when reinstatement of the contract is not desired.

20. The consequence of such a ruling would be absurd. The holder would be required to return the vehicle without regard to its insurance and demand evidence of insurance the next day which if not provided would be a default for which the holder could repossess the vehicle.

21. Mr. Conroy testified that only one of Debtor's references checked out, she had no employment which generated a pay stub and her insurance, issued in Ohio, could be cancelled because she did not reside there. Stating that he believed Debtor to be a "skip hazard," he advised Kulba against reinstatement although she had fulfilled all the requisites of reinstatement, whether imposed by MVSFA and the Notice of Repossession or those additionally imposed contemporaneously by Chrysler.

knowingly false because Chrysler had not decided to reinstate her contract and return the Automobile, Debtor cured the Arrears by paying $1,100 and provided the requested information. Chrysler then determined to retain its collateral because it found Debtor a credit risk. Chrysler was not obligated to allow Debtor to reinstate the contract but decided to offer her that option. Having done so, Chrysler's conduct in failing to reinstate and return the Debtor's Automobile when she had done all that was required of her, including providing certain information that was never referenced in its own Notice of Repossession, was an unfair and deceptive practice which the catchall provision of UDAP was designed to address. *See Creamer v. Monumental Properties, Inc., supra,* 329 A.2d at 826 ("this catchall is designed to cover generally all unfair and deceptive acts"). Judgment will be entered in favor of the Debtor on Count VII of the Complaint.

### III. *Emotional Distress*

■ Count VIII of the Complaint alleges that Chrysler intentionally or, in the alternative, negligently inflicted severe emotional distress on the Debtor. An essential element of both intentional and negligent infliction of emotional distress is physical injury, harm or illness. *E.g., Corbett v. Morgenstern,* 934 F.Supp. 680 (E.D.Pa.1996) (construing Pennsylvania law). Here, the Debtor failed to present evidence of any physical injury, harm or illness resulting from Chrysler's actions. While there are limited circumstances, not applicable here, which allow a claim for negligent infliction of emotional distress absent physical injury,[22] notably Debtor also failed to present any evidence of emotional distress resulting from Chrysler's actions. Judgment will be entered in favor of Chrysler on Count VIII of the Complaint.

### IV. *Damages*

■ Having proven Chrysler's willful violation of the automatic stay, Debtor is entitled to "actual damages, including costs and attorneys' fees" 11 U.S.C. § 362(h). Similarly, the UDAP entitles the victim of the unlawful practice to "actual damages or one hundred dollars ($100), whichever is greater," as well as attorneys' fees and costs. 73 P.S. § 201–9.2(a). Damages under either statute must be quantifiable and cannot be based on speculation or conjecture. *See In re Sumpter,* 171 B.R. 835, 844 (Bankr.N.D.Ill.1994) (discussing actual damages for a stay violation); *In re Clark,* 96 B.R. 569, 582 (Bankr.E.D.Pa.1989) ("damages under UDAP are limited to money or property actually lost").

The Debtor alleges that her damages are: "the November 1999 payments [$1,100], her out[-]of[-]pocket expenses, transportation costs, lost [*sic*] of benefit and use of her automobile and the contents thereof, mental anguish, court costs and attorney fees." Amend. Compl. ¶ 35(d). She also requests punitive damages. Complaint § IV. (Prayer for Relief). I

---

22. *Rolla v. Westmoreland Health Sys.,* 438 Pa.Super. 33, 651 A.2d 160, 163 n. 2 (1994). "For examples of compelling circumstances which work to avoid the general rule, *see: Speck v. Finegold,* 497 Pa. 77, 439 A.2d 110 (1981) (parent allowed recovery for mental distress caused by birth of unplanned, genetically defective child); *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979) (recovery for mental distress permitted for parent who witnessed tortious assault upon her minor child); and *Little v. York County Earned Income Tax Bureau,* 333 Pa.Super. 8, 481 A.2d 1194 (1984) (allowing recovery by plaintiff who had been wrongfully imprisoned because of negligent misrepresentation to tax bureau that plaintiff had failed to pay taxes)."

address each of these in turn, focusing on the statutory authority for the award.

■ Debtor's November 1999 payments of $1,100 are a proper measure of damages under the UDAP as an "ascertainable loss of money" resulting from Chrysler's illegal conduct, 73 P.S. § 201–9.2(a), namely its misrepresentation of the Debtor's duties under the MVSFA and its failure to return the automobile after the Debtor made the November 1999 payments.[23]

Requiring Chrysler to return the November 1999 payments serves the purpose of remedies generally, to restore the parties as closely as possible to their original positions. Analogizing to the law of contracts, the Debtor has a restitution interest which should be protected " '[by requiring] the other party to disgorge the benefit he has received by returning it to the party who conferred it.' " *Trosky v. Civil Service Commission*, 539 Pa. 356, 652 A.2d 813, 817 (1995) (*quoting* the Restatement (Second) of Contracts, Section 344, Comment a). Similarly, a remedy in tort should " 'attempt[ ] primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort.' " *Id.* (*quoting* the Restatement (Second) of Torts, Section 901, Comment a). Because the award is property of debtor's Chapter 7 estate, however, Chrysler shall remit the November 1999 payments of $1,100 to the Chapter 7 trustee

who will determine whether it is properly exempted and if so, forward it to Debtor.

■ The Debtor's testimony regarding the loss of personal items allegedly contained in the automobile was wholly incredible, and her lack of credibility similarly affected her testimony regarding alleged damages from loss of the use of the Automobile. The Debtor "estimated" that she spent approximately $1,500 in public transportation costs and compensation to friends and/or family for transportation, but failed to present concrete testimony or documentation which would support this estimate. The Debtor had no regular employment, personal obligations or other identifiable occasions of travel supporting her claim for alternate transportation costs.[24] Her vague references to occasional shopping excursions and visits to friends and family, none of which were identified in any quantifiable manner, are wholly insufficient to support an award of actual damages.[25] *Compare Cox v. Billy Pounds Motors, Inc. (In re Cox)*, 214 B.R. 635 (Bankr.N.D.Ala.1997) (evidence of lost employment as a result of loss of transportation from wrongful repossession of his automobile, including a work history from which the Court could reasonably calculate compensation); *Brooks v. World Omni (In re Brooks)*, 207 B.R. 738 (Bankr.N.D.Fla.1997) (evidence of towing costs and car rental costs).

---

**23.** These payments are not damages resulting from the violation of the automatic stay given that they were paid more than two weeks before the filing of her bankruptcy case.

**24.** The Debtor testified that she was employed by a friend to do some filing, but was able to perform this work at home when she lost the use of her car.

**25.** Being denied the use of the Automobile undoubtedly had an adverse effect upon the

Debtor, but the Court cannot compensate her for this effect based upon speculation. *Sumpter, Clark, supra.* The Debtor failed to meet her burden of providing credible evidence of actual damages suffered from the loss of the use of the Automobile. I am, therefore, unable to compensate her for this loss. The award of punitive damages, *infra*, ameliorates the harshness of this result.

In addition to her Count VIII tort claim for intentional or negligent infliction of emotional distress, the Debtor also seeks damages for emotional distress, mental anguish and humiliation resulting from Chrysler's violation of the automatic stay and the UDAP. While both of these statutes allow damages for such injury, they nonetheless require that the emotional injury be proven. As stated above, the Debtor simply failed to present any evidence of such suffering which might warrant even an award of nominal damages.[26] *Compare Dukes v. Firstrust Bank and Blvd. Mortgage Co (In re Dukes)*, 1997 WL 860676 (Bankr.E.D.Pa.1997) (awarding $100 based on plaintiff's testimony of devastation, headaches and high blood pressure); *Wagner v. Ivory (In re Wagner)*, 74 B.R. 898, 900–01 (Bankr.E.D.Pa.1987) (awarding plaintiff $100 for shock and alarm arising from verbal assault in his home).

Having proven a violation of the relevant statutes, the Debtor is entitled to attorneys' fees and costs incurred in filing and prosecuting this adversary action. 11 U.S.C. § 362(h); 73 P.S. § 201–9.2(a). I will allow Debtor's counsel to submit a certification of fees and costs and allow Chrysler the opportunity to file an objection to the reasonableness of such fees and costs.

The Debtor also seeks punitive damages for Chrysler's violation of the automatic stay. In determining whether to award such damages and if so, in what amount, the following factors are considered: (1) the nature of the respondent's conduct; (2) the respondent's motives; (3) any provocation by the debtor; and (4) the respondent's ability to pay. *In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 487 (E.D.Pa.1989); *In re Wagner*, 74 B.R. 898, 905 (Bankr.E.D.Pa.1987). Such awards are a response to particularly egregious conduct and are, according to the Third Circuit Court of Appeals, "reserved for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir.1978).

Based on my consideration of the aforementioned factors, I conclude that the Debtor is entitled to an award of punitive damages. Chrysler's account records admittedly indicate a difficult relationship with the Debtor in which she had lost all credibility with Chrysler. It also appears that Chrysler had set into motion the process of selling the Automobile prior to the filing of the Petition. I have, however, concluded that Chrysler was advised on the filing of this bankruptcy case and notwithstanding its knowledge, proceeded to sell the Automobile at auction, thereby precluding Debtor from any effective relief in her Chapter 13 case with respect to this asset. It may be that Chrysler ultimately would have been allowed to retain the Automobile if Debtor was unable to provide it with adequate protection of its interest under 11 U.S.C. § 542. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205–08, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). However, it was for this Court, not Chrysler to conclude that its collateral was at risk because of Debtor's insurance coverage or uncertain residency status.[27]

---

26. For example, Debtor testified that upon leaving her sister's house the morning of the repossession, she believed her automobile had been stolen. Given the receipt of prior notices from Chrysler, that failure to cure contractual defaults would result in repossession, one has to take her testimony of "shock" rather lightly.

27. It is true that Chrysler's only knowledge of the bankruptcy as proven by the Debtor was the single phone call from the Debtor's attor-

Chrysler, an institutional lender, has established procedures for dealing with borrowers who file bankruptcy. Concluding that Debtor was a "flight risk," it chose to ignore them in this case. That decision merits the award of punitive damages in the amount of $4,500 which shall also to be paid by Chrysler to the Chapter 7 trustee for distribution to the Debtor or creditors, as appropriate.

▮▮▮▮ The UDAP also provides the Court with discretion to award treble damages. 73 P.S. § 201–9.2(a). In determining whether to award treble damages, courts are to be guided by the law governing punitive damages. *Johnson v. Hyundai Motor America,* 698 A.2d 631, 639 (Pa.Super.1997). Under Pennsylvania law, punitive damages may be awarded "only if an actor's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others." *Id.* Chrysler's UDAP violation relates to its failure to reinstate Debtor's contract after inducing her to cure the stated Arrears. The damage from that violation of the MVSFA has been remedied by the disgorgement of the payment otherwise due. I do not believe treble damages are warranted for the MVSFA violation.

## V. *Conclusion*

The Debtor has met her burden of proving the elements of her claims for violation of the automatic stay and the UDAP. Having done so, the Debtor's estate is shall be awarded the damages discussed above.

An order consistent with this Opinion shall issue.

## *ORDER*

**AND NOW,** this 24th day of May 2001, upon consideration of the Debtor's Complaint Seeking Turnover of Property and Damages For Violation of Automatic Stay and the Debtor's Amended Complaint, and after trial, and for the reasons set forth in the accompanying Memorandum Opinion;

It is hereby **ORDERED** and **DECREED** that:

(1) Pursuant to 11 U.S.C. § 362(h), judgment is entered in favor of Plaintiff and against Defendant, Chrysler Financial Co. ("Chrysler") on Counts I, II and IV of the Complaint in the amount of $4,500.

(2) Pursuant to 73 P.S. § 201–9.2, judgment is entered in favor of Plaintiff and against Chrysler on Count VII of the Complaint in the amount of $1,100.

(3) Plaintiff is entitled to the reasonable attorney's fees and costs which she incurred in prosecuting her claims under 73 P.S. § 201–9.2 and 11 U.S.C. § 362(h). Her counsel shall, within thirty days (30) of the date hereof, file with the Clerk of Court and serve upon opposing counsel an application, in accordance with Local Bankruptcy Rule 2016–3 for approval of

---

ney, received before Chrysler had any evidence of his representation of the Debtor. This telephone call was sufficient to trigger Chrysler's duty to halt the intended sale and further investigate. While Chrysler actions were not as egregious and flagrant a disregard of the automatic stay as evidenced in other cases where multiple notices were received, such distinction bears only on the amount of punitive damages not whether they should be awarded *Compare In re Meeks,* 260 B.R. 46 (Bankr.M.D.Fla.2000) ($35,000 awarded as punitive damages where creditor, which filed proof of claim and requested a copy of the Chapter 13 plan, thereafter repossessed automobile in violation of stay); *In re Cepero,* 226 B.R. 595 (Bankr.S.D.Ohio 1998) (award of $12,000 punitive damages against creditor who ignored numerous notices from debtor's counsel); *Diviney v. NationsBank of Texas (In re Diviney),* 211 B.R. 951 (Bankr. N.D.Okla.1997) (punitive damages of $40,000 awarded based upon sale of the debtors' repossessed automobile followed by attempts at collecting deficiency despite numerous notices of the pending bankruptcy).

such fees and costs. Chrysler shall have ten (10) days thereafter to file an objection to the application. If an objection is timely filed, then the application shall be scheduled for hearing. If no objection is filed, then the application shall be ruled upon without a hearing pursuant to applicable decisional law in this Circuit. *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833 (3d Cir.1994).

(4) Chrysler shall pay the judgment amount to the Chapter 7 trustee for the benefit of the Debtor and her creditors, as their interests may appear.

(5) Judgment is entered in favor of Chrysler and against Plaintiff on Count VIII of the Complaint for intentional and/or negligent infliction of emotional distress.